**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CANDY PELLEGRINI,**

                                **Plaintiff,**                      **1:08-cv-1012**
                                                                                        **(GLS/RFT)**

                        **v.**

**SOVEREIGN HOTELS, INC.,** d/b/a **BEST**
**WESTERN HOTEL; MARY KOROSO;**
**JOHN LAURIN;** and **MATTHEW**
**HAMZAOUI,**

                                **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PLAINTIFF:**
O'Connell, Aronowitz Law Firm          JEFFREY J. SHERRIN, ESQ.
54 State Street, 9th Floor             KURT E. BRATTEN, ESQ.
Albany, NY 12207

**FOR THE DEFENDANTS:**
Office of John E. Coyne                 JOHN E. COYNE, ESQ.
50 Congress Street, Suite 200
Boston, MA 02109

Phillips, Lytle Law Firm                MARC H. GOLDBERG, ESQ.
Omni Plaza
30 South Pearl Street
Albany, NY 12207

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Candy Pellegrini commenced this action against defendants Sovereign Hotels, Inc., Mary Koroso, John Laurin, and Matthew Hamzaoui under Title VII of the Civil Rights Act of 1964[1] and New York State Human Rights Law (NYSHRL),[2] alleging employment-related gender discrimination and unlawful retaliation. (*See* Compl., Dkt. No. 1.) Pending is defendants' motion for summary judgment. (Dkt. No. 26.) For the reasons that follow, the motion is granted in part and denied in part.

### II. Background

#### A. Factual History

On March 26, 2007, plaintiff Candy Pellegrini began her employment as a front desk clerk for defendant Sovereign Hotels, Inc., then doing business as the Best Western Hotel in Albany, New York. (*See* Defs. SMF ¶¶ 2, 10, Dkt. No. 26:20.) Upon her own request, Pellegrini generally worked the "A" shift on weekdays between 7:00 a.m. and 3:00 p.m. (*See id.* at ¶¶ 8, 10.) Her duties included checking hotel guests in and out,

---

[1]42 U.S.C. § 2000e, *et seq.*

[2]N.Y. Exec. Law §§ 290, *et seq.*

taking reservations, and answering phones.  (*See id.* at ¶ 9.)  Due to her

mother's illness, Pellegrini regularly took time off and frequently could not

work her schedule, leaving Sovereign to find someone to work in her place.

(*See id.* at ¶¶ 11, 13-15.)  While her mother passed away on June 25,

2007, Pellegrini's scheduling irregularity continued.  (*See id.* at ¶ 19.)

In June 2007, Sovereign hired Joshua Parkhurst to work in the food-

service department.  (*See* Pl. Resp. SMF ¶ 18, Dkt. No. 30.)  Shortly

thereafter, on July 16, Parkhurst began working for Sovereign as a front

desk clerk on the "B" shift.  (*See* Defs. SMF ¶ 22, Dkt. No. 26:20.)  While

the "A" shift technically ended where the "B" shift began, (*see id.* at ¶ 25),

in practice, Pellegrini and Parkhurst's shifts would regularly overlap by

anywhere from five minutes to an hour.  (*See* Pl. Resp. SMF ¶¶ 53, 112,

Dkt. No. 30.)

According to Pellegrini, within days of Parkhurst's start as a front

desk clerk, he began a campaign of aggressive sexual harassment and

threatening behavior against her.  Specifically, during his first week,

Parkhurst told Pellegrini she had a "nice ass," groped her rear end, called

her a "bitch" when she rebuked him, stated that he wanted to "fuck" her,

grabbed her by the arm and forcibly kissed her on the lips, and subjected

her to other inappropriate comments.  (*See id.* at ¶¶ 31-33, 36, 113.)  In addition, over the same period of time, Parkhurst repeatedly telephoned Pellegrini outside of work, saying similar things.  (*See id.* at ¶¶ 31-33, 114.)  In response, Pellegrini complained about Parkhurst's conduct to her managers, including defendants Mary Koroso, Matthew Hamzaoui, and John Laurin.  (*See id.* at ¶¶ 32-33, 113-15; *but see* Defs. SMF ¶ 36, Dkt. No. 26:20 (stating that Pellegrini did not complain that the conduct was sexual in nature).)  While the parties dispute whether Pellegrini was made aware of Sovereign's harassment reporting policy, it seems that Pellegrini acted in compliance with Sovereign's policy.  (*Compare* Defs. SMF ¶¶ 34-37, Dkt. No. 26:20, *with* Pl. Resp. SMF ¶¶ 34-35, Dkt. No. 30.)  According to defendants, Koroso subsequently met with Parkhurst and told him to cease calling Pellegrini, which Parkhurst denied doing.  (*See* Defs. SMF ¶ 38, Dkt. No. 38.)  And after Pellegrini complained to Koroso a second time, the calls stopped.  (*See id.* at ¶ 40.)

During a subsequent encounter between Pellegrini and Parkhurst, Parkhurst approached Pellegrini, grabbed her by the arm, and kissed her.  (*See id.* at ¶ 46.)  Again, after Pellegrini's rebuke, Parkhurst said "how do you like that bitch."  (*See id.*)  While defendants point out that Pellegrini did

4

not report this incident immediately after it occurred, (*see id.* at ¶ 48),
Pellegrini asserts that she spoke to both Koroso and Laurin within days of
its occurrence, (*see* Pl. Resp. SMF ¶¶ 47-48, Dkt. No. 30).

On July 28, 2007, while Pellegrini and Parkhurst were working a
banquet as servers, Parkhurst allegedly groped Pellegrini's breasts and
said "nice tits." (*See id.* at ¶ 116.) The same night, after seeing Pellegrini
talking with another male employee, Parkhurst grabbed Pellegrini by the
arm, forcibly kissed her on the lips, and said "how do you like that?" (*See
id.*) When Pellegrini demanded to be let go, Parkhurst told her to "watch
[her] step" or someone will "get hurt." (*Id.*) Pellegrini reported this incident
to Koroso on her next shift. (*See id.*) On August 12, after Pellegrini
received flowers from a guest at a wedding banquet the previous night,
Parkhurst allegedly punched a wall and a chair, grabbed Pellegrini by the
back of the neck, kissed her, and told her that she "belongs" to him. (*See
id.* at ¶¶ 108, 117.)

On August 22, 2007, upon Koroso's request, Pellegrini worked the
"B" shift with Parkhurst. (*See* Defs. SMF ¶ 51, Dkt. No. 26:20.) During that
shift, Pellegrini's boyfriend called the hotel phone twice, but Parkhurst
answered the phone both times. After the two calls, Parkhurst told

Pellegrini that he did not want her receiving personal phone calls from men, that she was not supposed to receive personal phone calls from her boyfriend, and that she was "going to pay for that phone call."  (*See id.* at ¶¶ 54-60.)  Later in the shift, while in the computer room, Parkhurst allegedly grabbed Pellegrini by the arm, kissed her, and said "how do you like that bitch," to which Pellegrini called him a "pervert" and told him to stay away from her.  (*See id.* at ¶¶ 61-63.)  Parkhurst then followed her into the office and kicked the back of the chair Pellegrini was sitting in.  (*See id.* at ¶ 64.)  After a third call from Pellegrini's boyfriend, Parkhurst threatened to do physical harm to Pellegrini and her boyfriend.  (*See id.* at ¶ 70.)  The same night, Pellegrini went to Hamzaoui, the manager on duty, and told him about the threats she received from Parkhurst.  (*See id.*)  After speaking with Parkhurst, who denied everything, Hamzaoui called Koroso.  (*See id.* at ¶ 71.)  Koroso told Hamzaoui to get a written statement from Pellegrini, which he did.  (*See id.* at ¶¶ 71-76.)  In her statement, Pellegrini detailed these events as well as several other prior incidents, including one in the hotel's pool room where Parkhurst made inappropriate comments, threatened Pellegrini, and told her that he had been to jail before and was not afraid to go back.  (*See id.* at ¶¶ 77-81; *see also* Pl. Resp. SMF ¶¶ 78-

6

81, Dkt. No. 30.)  After one of these incidents, Pellegrini also allegedly reported Parkhurst's conduct to Laurin.  (*See* Pl. Resp. SMF ¶ 83, Dkt. No. 30.)

The next day, August 23, Pellegrini informed Koroso about the prior day's events, and asked Koroso if she could end her shifts before Parkhurst arrived to work.  (*See id.* at ¶ 85.)  While Koroso said she would accommodate Pellegrini's request after she returned from vacation, Koroso's vacation was not set to begin until September 7.  (*See* Defs. SMF ¶ 86, Dkt. No. 26:20.)

Defendants allege that Koroso spoke with Parkhurst about the August 22 events and that Parkhurst denied any wrongdoing and blamed Pellegrini's boyfriend's calls for interfering with work.  (*See id.* at ¶¶ 87-88.)  And according to defendants, after this lone conversation, "Koroso assumed the situation between Pellegrini and Parkhurst was resolved." (*Id.* at ¶ 89; *see also* Bratten Aff., Pl. Ex. 7, Koroso Dep. at 48-54, Dkt. No 32:7.)

On September 7, 2007, Sovereign terminated Pellegrini's employment allegedly due to her scheduling conflicts and attendance problems.  (*See* Defs. SMF ¶¶ 91-104, Dkt. No. 26:20.)  Parkhurst was

7

later fired, reportedly based on a complaint Pellegrini made after her termination to the hotel's General Manager, Suparmanto.  (*See* Pl. Resp. SMF ¶ 123, Dkt. No. 30; *see also* Bratten Aff., Pl. Ex. 4, Dkt. No. 32:4; Bratten Aff., Pl. Ex. 7, Koroso Dep. at 86-90, Dkt. No. 32:7.)

**B.   Procedural History**

On February 14, 2008, Pellegrini filed a verified complaint with the New York State Division of Human Rights and the Equal Employment Opportunity Commission.  (*See* Bratten Aff., Pl. Ex. 1, Dkt. No. 32:1.)  On August 8, 2008, after dismissing her verified complaint, Pellegrini received a right-to-sue letter notifying her of the right to file a civil action under Title VII in state or federal court.  (*See* Compl. ¶ 5, Dkt. No. 1.)  Consequently, on September 24, 2008, Pellegrini commenced this action against Sovereign, Koroso, Laurin, and Hamzaoui, alleging retaliation and gender-based hostile work environment discrimination.  (*See id.* at ¶¶ 32-44.)  In asserting her hostile work environment claim, Pellegrini alleged that defendants subjected her to a pattern of discriminatory conduct by creating, condoning, and failing to correct an intimidating, hostile, and offensive work environment.  (*See id.*)  On March 12, 2010, defendants moved for summary judgment on Pellegrini's claims.  (*See* Dkt. No. 26.)

8

### III.  **Standard of Review**

The standard for the grant of summary judgment is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle*, 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).  In the fact-intensive context of a discrimination action, "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001); *see also Gallo v. Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("A trial court must be cautious about granting summary judgment to an employer when ... its intent is at issue.").

### IV.  **Discussion**

### A.  **Title VII and Individual Liability**

As a preliminary matter, the court notes that "individuals are not subject to liability under Title VII."  *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam) (citation omitted).  Accordingly, Pellegrini's Title VII claims against Koroso, Laurin, and Hamzaoui are dismissed.  *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).

**B.    Hostile Work Environment**

Under Title VII, it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

"A hostile work environment claim requires a showing (1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  Under the first prong, the plaintiff must demonstrate that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  *Id.* (citations omitted).  The plaintiff must show both that the misconduct was "severe or pervasive enough to create an objectively hostile or abusive work environment" and that she "subjectively perceive[d] that environment to be abusive."  *Id.*  And to "meet the threshold of severity or

10

pervasiveness," incidents must be "sufficiently continuous and concerted" rather than episodic or isolated. *Id.* (internal quotation marks and citation omitted).

The second prong requires that the plaintiff demonstrate a basis for imputing the misconduct to the employer. Under Title VII, "employers are not automatically liable for sexual harassment perpetrated by their employees." *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). Rather, where the harassment is attributed to the plaintiff's co-worker, "the employer will be held liable only for its own negligence." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) (citing *Faragher*, 524 U.S. at 802-07). Accordingly, the plaintiff "must demonstrate that her employer failed to provide a reasonable avenue for complaint[,] or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks and citation omitted). Where the employer has provided a reasonable avenue for complaint, the plaintiff must "show that (1) someone had actual or constructive knowledge of the harassment, (2)

11

the knowledge of this individual can be imputed to the employer, and (3)

the employer's response, in light of that knowledge, was unreasonable."

*Id.* at 763 (emphasis omitted).

Here, defendant Sovereign devotes a large part of its papers to

arguing that the events alleged neither occurred over a sufficient length of

time in the aggregate nor constituted sufficiently severe incidents

individually.[3]  (*See* Defs. Mem. of Law 9-17, Dkt. No. 26:21.)  The court

disagrees.  Contrary to Sovereign's contentions that the incidents alleged

were "sporadic and not so severe," (Defs. Mem. of Law at 17, Dkt. No.

26:21), the conduct alleged by Pellegrini illustrates a workplace in which

---

[3]In support of these arguments, Sovereign highlights portions of Pellegrini's deposition testimony to suggest that Pellegrini has repudiated her allegations regarding incidents that occurred while she was working as a banquet server. (*See* Defs. Mem. of Law at 9-11, Dkt. No. 26:21 (citing Coyne Decl., Defs. Ex. 8, Pellegrini Dep. at 210-211, Dkt. No. 26:9).) However, this portion of the testimony is neither conclusive in itself—particularly in light of the questions asked and Pellegrini's wavering, non-specific responses—nor inconsistent with Pellegrini's allegations. (*See* Coyne Decl., Ex. 8, Pellegrini Dep. at 205-211, Dkt. No. 26:9.) Thus, while certain evidence may seem conclusive when viewed in isolation, the record viewed in its totality reveals questions of fact and credibility that are best left for a factfinder to resolve.

With regard to Sovereign's challenge to the admissibility of Pellegrini's proffered affidavit, (*see generally* Def. Reply Mem. of Law, Dkt. No. 33 (challenging Pellegrini Aff., Dkt. No. 31)), the court is satisfied as to the adequacy of the record absent the affidavit. Nonetheless, while Sovereign's point is well taken, the affidavit is sufficiently compliant with the requirements of FED. R. CIV. P. 56(e)(1) and the principles outlined in *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).  The court appreciates Sovereign's concerns—and shares some skepticism—as to the basis for some of Pellegrini's contentions, especially those involving (1) Pellegrini's uncorroborated "beliefs" about Sovereign's employment records and (2) the events surrounding Pellegrini's work as a banquet server. Therefore, to the extent that the additional contents of Pellegrini's affidavit need be considered, the court will weigh such contents carefully.

the harassment engaged in by Parkhurst was sufficiently severe and pervasive as to alter the conditions of Pellegrini's employment and create an abusive and intimidating working environment.  From the multiple phone calls and inappropriate comments to the constant threats and serial physical abuse, there is no question that Parkhurst's conduct was constant, severe, and pervasive—so much so that Pellegrini experienced the harassment even outside the workplace.  Likewise, as to the parties' disputes about the substance of Pellegrini's complaints to Koroso, Laurin, and Hamzaoui, and how those complaints color Pellegrini's subjective perception of Parkhurst's conduct at the time, the record contains ample evidence demonstrating that Pellegrini perceived the environment to be abusive and hostile, repeatedly voiced her concerns and complaints, and experienced adverse effects as a result of Parkhurst's conduct.  (*See, e.g.*, Bratten Aff., Pl. Ex. 18, Bashkoff Psychological Evaluation, Dkt. No. 32:18.) Whether Pellegrini has accurately reported the nature and extent of the conduct is a question of fact for a jury to resolve.

The court is equally satisfied that a specific basis exists for imputing Parkhurst's objectionable conduct to Sovereign.  First, there is some evidence on the record, aside from Pellegrini's allegations, raising a

question about whether Sovereign had a complaint policy and procedure in place and whether it notified Pellegrini, Parkhurst, and their supervisors about such a policy.  (*See* Bratten Aff., Pl. Ex. 8, Hamzaoui Dep. at 15-18, 23, Dkt. No. 32:8; Bratten Aff., Pl. Ex. 9, Laurin Dep. at 14, Dkt. No. 32:9.)  For instance, the undisputed facts of the August 22 incident suggest that Hamzaoui was unsure how to address and handle Pellegrini's sexual harassment complaint.  In addition, it is quite curious that Koroso, who instructed Hamzaoui to take Pellegrini's written statement, never actually reviewed the statement—a statement that is now unavailable.  (*See* Bratten Aff., Pl. Ex. 7, Koroso Dep. at 53-54, Dkt. No. 32:7.)  It is also noteworthy that the October 1996 policy that Sovereign has produced directs employees with discrimination complaints to the state and federal agencies of Massachusetts rather than New York.  (*See* Coyne Decl., Defs. Ex. 2, Dkt. No. 26:3.)

Second, even if Sovereign could conclusively prove that it provided a reasonable avenue for its Albany hotel employees to make complaints, there is ample evidence from which a reasonable jury could find that Sovereign knew about Parkhurst's conduct yet failed to take appropriate remedial action.  Although Sovereign disputes the specificity and

14

extensiveness of Pellegrini's complaints, there is no dispute that Pellegrini repeatedly voiced her concerns and complaints to her three immediate supervisors, consistent with Sovereign's proffered policy which designates immediate supervisors to receive reports of sexual harassment. (*See id.*; *see also* Coyne Decl., Defs. Ex. 11, Laurin Dep. at 15-16, Dkt. No. 26:12.) Moreover, it is undisputed that Pellegrini filed a written complaint with Hamzaoui, who was the manager on duty the night of August 22. Accordingly, there are sufficient grounds upon which to impute knowledge of Parkhurst's conduct and Pellegrini's complaints to Sovereign. Equally important, the quantity and nature of Pellegrini's complaints and the consequent actions—or inaction—of Koroso, Laurin, and Hamzaoui manifest the potential unreasonableness of Sovereign's response. Specifically, even assuming Koroso addressed Pellegrini's phone call complaints adequately, the record is otherwise devoid of any evidence demonstrating that Sovereign took Pellegrini's complaints seriously or responded to them in any meaningful way by conducting an investigation, maintaining a contemporaneous record, providing additional oversight, or making followup inquiries. Instead, the testimony of Pellegrini's supervisors, particularly Koroso, indicate that Pellegrini's complaints were

given minimal attention and were addressed largely in the context of how they would impair *her* job performance.  (*See, e.g.*, Bratten Aff., Pl. Ex. 7, Koroso Dep. 37-54, Dkt. No. 32:7; Bratten Aff., Pl. Ex. 8, Hamzaoui Dep. at 38-43, 61-62, Dkt. No. 32:8; .)

Therefore, in light of the significant issues of material fact that remain, the court denies Sovereign's motion for summary judgment on Pellegrini's discrimination claim of hostile work environment.

## C.  <u>Retaliation</u>

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).

In analyzing claims of retaliation, courts apply the burden-shifting rules first set forth in *McDonnell Douglas Corp. v. Green*, which place upon the plaintiff the initial burden of making out a prima facie case of retaliation. 411 U.S. 792 (1973).  The Second Circuit characterizes this initial burden as "minimal."  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (citations omitted).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) [she] participated in a protected activity,

(2) the defendant knew of the protected activity; (3) [she] experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action." *Jackson v. N.Y. City Transit*, 2009 WL 3287558, at *2 (2d Cir. Oct. 14, 2009) (citation omitted). "Protected activity" includes both the filing of formal discrimination charges and informal protests such as making complaints to management. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). As to the fourth prong, "[p]roof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *See DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).

Once a prima facie case of retaliation is established, the burden shifts to the employer to "proffer[] a legitimate, non-retaliatory reason for the challenged employment decision." *Jackson*, 2009 WL 3287558, at *2. If the employer proffers a legitimate, non-retaliatory reason for the challenged employment action, the presumption of retaliation drops out, and the

17

employer "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited [retaliation]." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).  The plaintiff must then present sufficient evidence to "permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation," *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001), and that "the prohibited factor was at least one of the motivating factors," *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citation omitted).

Here, Pellegrini can clearly demonstrate that she engaged in a protected activity by making her complaints, that Sovereign knew of this protected activity, and that she suffered an adverse employment action when she was terminated.  Sovereign takes issue with the fourth prong of the prima facie case, contending that Pellegrini has failed to demonstrate any causal connection between her complaints and her termination.  And while Pellegrini's basis for a nexus appears somewhat thin, the temporal proximity of her complaints and termination combined with her testimony that Koroso became unfairly critical of her after August 22, (*see* Bratten Aff., Pl. Ex. 6, Pellegrini Dep. at 201-03, Dkt. No. 32:6), are enough to

establish a causal connection.[4]  Thus, Pellegrini has adequately

established a prima facie case of retaliation.

    In response, Sovereign has proffered a legitimate, non-retaliatory

reason for terminating Pellegrini.  There is little debate between the parties

that Pellegrini's scheduling limitations, restrictions, and irregularities were

constant from the beginning to the end of her employment.  However,

although Sovereign admittedly consented to Pellegrini's scheduling

conditions upon hiring her, the parties dispute whether those conditions

were only predicated on treating her mother or whether they also

contemplated Pellegrini's need to take care of her children.  In addition, as

discussed in footnote four, there is some evidence suggesting that

Sovereign did not take any adverse action against other employees with

––––––––––––––––––––

    [4]With regard to the causal connection analysis, the court finds somewhat incongruous and unsound Pellegrini's additional assertion that she was treated differently than Parkhurst based on the work schedule and timesheets for July 15 to September 1, 2007, which show that Parkhurst missed more total hours over the course of that period.  (*See* Bratten Aff., Pl. Exs. 11-14, Dkt. Nos. 32:11-14.)  First, this period is quite limited in scope, particularly since Pellegrini's start predated this period by almost four months, during which time inconsistencies and discrepancies regularly arose in availability and hours worked.  Second, the same records demonstrate that Parkhurst was scheduled to work and ultimately did work a significantly higher number of hours than Pellegrini.  Third, Pellegrini herself concedes that "it is not a fair comparison since [Sovereign's] [f]ront [d]esk [s]chedules are inaccurate."  (*See* Pl. Mem. of Law at 20, Dkt. No. 29.)  And fourth, there is no evidence concerning why Parkhurst worked fewer hours than he was scheduled to work—i.e., whether he sought to be excused, was permitted to work fewer hours, or was asked to do so.  Thus, this comparison is insufficient to establish a nexus based on disparate treatment.

    Nonetheless, the evidence regarding other employees' failure to meet their scheduled hour requirements and the lack of any action taken by Sovereign against them may raise a question about the credibility of Sovereign's proffered reason for terminating Pellegrini.

similar scheduling transgressions.  And while not entirely inconsistent, Koroso's testimony does create some confusion as to the timing of and basis for Sovereign's decision to terminate Pellegrini.  (*See* Bratten Aff., Pl. Ex. 7, Koroso Dep. at 61-64, Dkt. No. 32:7.)  The reliability of Sovereign's records is also in dispute.

Therefore, because the record sufficiently supports Pellegrini's contention that Sovereign's proffered explanation was a pretext for impermissible retaliation, the court denies Sovereign's motion for summary judgment on Pellegrini's retaliation claim.

**D.**   **New York State Human Rights Law**

"[C]laims brought under [NYSHRL] are analytically identical to claims brought under Title VII.  *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997) (citation omitted); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000) ("The identical standards apply to employment discrimination claims brought under Title VII ... [and] New York Executive Law § 296 ...." (citations omitted)).  Accordingly, as to Pellegrini's discrimination and retaliation claims against Sovereign, the motion for summary judgment is denied.

Unlike Title VII though, the NYSHRL provides several bases upon

20

which an individual employee may be held liable.  First, under N.Y. EXEC.
LAW § 296(1), individual liability attaches where an employee is shown to
have an "ownership interest or any power to do more than carry out
personnel decision made by others."  *Patrowich v. Chem. Bank*, 63 N.Y.2d
541, 542 (1984).  The "power to do more than carry out personnel
decisions made by others" essentially amounts to the authority "to hire or
fire" people.  *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995),
*abrogated on other grounds*, *Ellerth*, 524 U.S. 742, and *Faragher*, 524 U.S.
775).  Here, Koroso testified that her personnel responsibilities included
hiring and firing and that she made the decisions to hire and fire Pellegrini.
(*See* Bratten Aff., Pl. Ex. 7, Koroso Dep. at 11, 15, 54, 61-64, Dkt. No.
32:7.)  Consequently, while there is no evidentiary basis for Laurin's or
Hamzaoui's liability under § 296(1), Pellegrini's claims against Koroso
under § 296(1) are viable.

Employees may also be held individually liable under N.Y. EXEC. LAW
§ 296(6) for, among other things, aiding and abetting discriminatory
practices.  *See Feingold v. New York*, 366 F.3d 138, 157-58 (2d Cir. 2004).
In general, an aider and abettor is one "who actually participates in the
conduct giving rise to a discrimination claim."  *Tomka*, 66 F.3d at 1317

(citations omitted) (holding that individual may be liable where he actually assaulted the plaintiff); *see, e.g.*, *Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 261-62 (E.D.N.Y. 2009) (holding that individual may be liable where he engaged in harassment, assault, and intimidation); *McIlwain v. Korbean Int'l Inv. Corp.*, 896 F. Supp. 1373, 1383 (S.D.N.Y. 1995) (finding individual "actively participated" by engaging in discriminatory behavior); *Poulsen v. City of N. Tonawanda*, 811 F. Supp. 884, 900 (W.D.N.Y. 1993) (holding that individual may be liable where he actually perpetrated harassment).  Importantly, since "[i]t is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting," *Murphy v. ERA United Realty*, 251 A.D.2d 469, 472 (2d Dep't 1998), a plaintiff "cannot prevail against [an individual] on her state ... claims unless she can first establish the liability of [her employer]," *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999).

Critical to this case, the Second Circuit has held that an individual may be liable under § 296(6) where he "not only took no action to remedy [the alleged] behavior although [he] was aware of it, but also terminated [plaintiff's] employment on the basis of impermissible factors." *Feingold*,

22

366 F.3d at 158.  While the *Feingold* court did not explicitly state that an intermediate supervisor's failure to take any remedial action is sufficient to constitute aiding and abetting, this court concludes that Laurin and Hamzaoui's alleged conduct in ignoring, writing off, discouraging, and failing to investigate Pellegrini's complaints could amount to acquiescence in and aiding and abetting of the creation of a hostile work environment. *See Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 381-84 (S.D.N.Y. 1999) ("[T]he case law establishes beyond cavil that a supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation' under [NYSHRL] § 296(6)."); *see, e.g.*, *Romero v. Howard Johnson Plaza Hotel*, No. 97 Civ. 3706, 1999 WL 777915, at *9 (S.D.N.Y. Sept. 29, 1999) (holding that a reasonable jury could find actual participation where supervisor repeatedly failed to intervene in or investigate discriminatory conduct and laughed at some of the conduct, thereby adding "fuel to the fire"); *Hicks v. IBM*, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999) (finding individual liability may arise where plaintiff alleged that supervisor's failure to take adequate remedial actions amounted to approval, encouragement, or condonation of the discriminatory conduct).  There is no evidence, however, that Laurin or

Hamzaoui participated in any retaliatory conduct.

And as to Koroso, there is no question that her actions in handling Pellegrini's complaints and terminating Pellegrini, if performed on an impermissible basis, would subject her to liability under § 296(6) as well. *See, e.g.*, *Oliver v. Gen. Nutrition Ctr.*, No. 97 Civ. 6800, 1999 WL 435208, at *3 (S.D.N.Y. June 25, 1999) (holding that supervisor may be individually liable where she questioned plaintiff's motive in making her complaints, criticized her performance after engaging in protected activity, and made the decision to terminate plaintiff).

Therefore, the court grants defendants' motion for summary judgment as to Pellegrini's NYSHRL retaliation claim against Laurin and Hamzaoui, but denies the motion as to Pellegrini's remaining NYSHRL claims against Koroso, Laurin, and Hamzaoui.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 26) is **GRANTED** in part as follows:

1.    Pellegrini's Title VII claims against Koroso, Laurin, and Hamzaoui are **DISMISSED**;

2.    Pellegrini's NYSHRL retaliation claims against Laurin and Hamzaoui are **DISMISSED**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 26) is **DENIED** as to Pellegrini's Title VII and NYSHRL claims against Sovereign, NYSHRL hostile work environment claims against Koroso, Laurin, and Hamzaoui, and NYSHRL retaliation claims against Koroso; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 15, 2010
Albany, New York

United States District Court Judge

25